23CA1042 Peo v Hernandez 10-16-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1042
Jefferson County District Court No. 20CR2000
Honorable Jason Carrithers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Samuel Hernandez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE SCHUTZ
J. Jones and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 16, 2025

---

Philip J. Weiser, Attorney General, Emmy A. Langley, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Sean James Lacefield, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Samuel Hernandez, appeals his convictions on two counts of felony menacing, one count of unlawful sexual contact, and two counts of third degree assault. Hernandez contends that the trial court violated his Sixth Amendment right to fully cross-examine the victim, N.W., concerning her outstanding deferred judgment and sentence and subjected him to double jeopardy by failing to merge his menacing convictions. We affirm the convictions and remand to the district court to amend the mittimus to reflect the merger of one count of felony menacing.

## I. Background

¶ 2 Hernandez and N.W. had been dating for about four months. They lived together in a studio apartment. Early one morning, Hernandez accused N.W. of being unfaithful. N.W. repeatedly denied the accusation, but the situation escalated when Hernandez grabbed a blender blade and threatened N.W. as she sat on a bed. Hernandez got within about a foot of N.W. and threatened to cut her face with the blade, and she backed away from him. Hernandez then put down the blender blade and pulled N.W. off the bed and onto the floor, injuring her knee in the process.

¶ 3    Hernandez continued to yell at N.W., repeating the same accusation of unfaithfulness.  He then obtained a large kitchen knife, pointed it at N.W., and repeatedly threatened to kill her.

¶ 4    N.W. left the apartment and Hernandez followed her for several blocks.  He continued to yell at and threaten her.  N.W. eventually returned to the apartment, where she tried to sleep.  At that time, Hernandez forced unwanted sexual contact on her.

¶ 5    The next morning, N.W. left the apartment and Hernandez again followed her.  After another physical and verbal altercation outside the apartment, N.W. left and called the police.  A police officer responded and noted N.W.'s injuries.  Police arrested Hernandez and he was later charged with two counts of menacing, one count of unlawful sexual contact, and three counts of third degree assault.  The first menacing count charged Hernandez with using the blender blade to threaten N.W.; the second menacing count alleged that Hernandez threatened her with a knife.

¶ 6    At trial, Hernandez attempted to cross-examine N.W. regarding a deferred judgment and sentence that she was serving.  N.W. answered some of the questions without objection from the prosecution, but as discussed in more detail below, the court

sustained some of the prosecutor's objections to defense counsel's questioning on relevance grounds and others because defense counsel's questions called for speculation.

¶ 7 The jury convicted Hernandez of all charges except one count of third degree assault. The trial court sentenced him to an indeterminate term of six years to life in the custody of the Department of Corrections (DOC) for the unlawful sexual contact conviction, a year in DOC custody for each menacing conviction, and thirty months in jail for the third degree assault convictions. The court ordered the sentence for the unlawful sexual contact conviction to run consecutively to the other sentences, with all of the other sentences to run concurrently.

¶ 8 Hernandez appeals his convictions and the failure to merge the menacing convictions.

## II. Cross-Examination of N.W.

¶ 9 Hernandez argues that his Sixth Amendment rights were violated when the trial court limited the scope of his cross-examination of N.W. concerning her deferred judgment and sentence. We disagree.

## A. Additional Facts

¶ 10    N.W. was the primary witness against Hernandez. During direct examination, N.W. testified that she was serving a deferred judgment and sentence, supervised by probation, for a previous criminal conviction for accessory to attempted first degree murder. She also testified that she did not receive any benefit in exchange for testifying. She explained that the reason she was testifying was "because [Hernandez] needs to pay for what he did."

¶ 11    Hernandez's theory of defense rested on the idea that N.W. was not a credible witness. In furtherance of this contention, Hernandez's counsel cross-examined N.W. about her deferred judgment and sentence.

> [DEFENSE COUNSEL]: [N.W.], the consequence of violating your probation is that you could go to prison?
>
> [N.W.]: Yes.
>
> [DEFENSE COUNSEL]: The consequence of violating your deferred judgment is that that accessory to commit attempted first-degree murder would remain on your record permanently?
>
> [N.W.]: Yes.
>
> [DEFENSE COUNSEL]: As opposed to if you were to successfully complete that deferred

judgment, that conviction would be off your record?

[N.W.]: Yes.

[PROSECUTOR]: Objection, relevance.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Your Honor, this goes to [N.W.'s] motivation as to why she would come in here and —

[PROSECUTOR]: If we could discuss this at the bench if it's going to go further than that, I would appreciate it.

THE COURT: The objection is sustained at this point.

. . . .

[DEFENSE COUNSEL]: — part of what would violate your probation and your deferred judgment would be if you were to pick up a new law violation?

[PROSECUTOR]: Objection, relevance.

[DEFENSE COUNSEL]: We can approach if the Court would like.  This is relevant.

[PROSECUTOR]: A new law violation has nothing to do with a previous conviction.

. . . .

THE COURT: The objection is sustained.  It's speculative.

¶ 12    In a later exchange outside the presence of the jury,

Hernandez's counsel argued that he should be permitted to fully

question N.W. about the deferred judgment and sentence to

challenge her credibility.  He also argued that if, as the defense

contended, N.W had either exaggerated or been untruthful in her

initial statements to law enforcement, then she would be motivated

to maintain these misstatements at trial to avoid a new criminal

charge and the possible revocation of her deferred judgment and

sentence.

¶ 13    The court maintained its initial ruling:

> It's speculation, in the first instance, as to
> whether or not [N.W.] has even made false
> accusations.  That's purely speculation.  That's
> certainly Mr. Hernandez's version, but there's
> no investigation or finding otherwise.  And
> then what the result of new charges might be
> is purely speculative.  There's a variety of
> outcomes with a deferred judgment and
> sentence . . . .

B.    Standard of Review

¶ 14    Generally, "[t]he scope and limits of cross-examination are

matters within the sound discretion of the trial court.  Absent a

showing of an abuse of that discretion, we will not disturb the

ruling of the trial court on review." *People v. Conyac*, 2014 COA

6

8M, ¶ 91 (citations omitted). "A trial court, however, has 'wide latitude, insofar as the Confrontation Clause is concerned, to place reasonable limits on cross-examination based on concerns about, for example, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation which is repetitive or only marginally relevant.'" *People v. Gonzales-Quevedo*, 203 P.3d 609, 614-15 (Colo. App. 2008) (quoting *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992)).

¶ 15    On the other hand, if cross-examination is limited to the point that it effectively deprives a defendant of the right to present a complete defense, then we review the error for constitutional harmless error. *See Conyac*, ¶ 93 ("A defendant's right to present a defense is violated only where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." (citing *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009))).

## C.    Analysis

¶ 16    The Sixth Amendment provides a defendant with the right to confront and cross-examine the witnesses against him. U.S. Const. amend. VI. The right of confrontation includes the ability to explore

7

whether a witness's testimony "might be influenced by a promise of, or hope or expectation of, immunity or leniency with respect to the pending charges against [her], as a consideration for testifying against the defendant." *People v. King*, 498 P.2d 1142, 1144-45 (Colo. 1972). Thus, when "a prosecution witness is on probation, the key question is whether there exists a 'might have been influenced nexus' between the witness's probationary status and her potentially biased motive for testifying." *Margerum v. People*, 2019 CO 100, ¶ 11.

¶ 17    Consistent with these principles, the supreme court has directed that a witness's probationary status is always relevant when the witness is on probation with the State and testifies for the prosecution. *Id.* at ¶ 12. Therefore, a defendant must always be permitted to ask a prosecution witness who is on probation in the same sovereign about her probationary status. *Id.*

¶ 18    Hernandez argues that these same principles permitted him to cross-examine N.W. about the status of her deferred judgment and sentence. We agree with Hernandez that a defendant has a right to question a witness testifying on behalf of the State about any pending deferred judgment and sentence that the witness may be

8

serving in Colorado. But we disagree with Hernandez's contention that the trial court unfairly limited his counsel's ability to meaningfully cross-examine N.W. about her deferred judgment and sentence.

¶ 19    N.W. testified on direct examination that she was serving a deferred judgment and sentence that was being supervised by the probation department. Hernandez's counsel then had an opportunity to cross-examine N.W., and, in doing so, elicited that the deferred judgment and sentence were entered on a charge of accessory to commit attempted first degree murder, and that a conviction on that charge would enter against N.W if the deferred judgment and sentence were revoked. Counsel also obtained N.W.'s acknowledgment that the conviction would not be on her record if she successfully completed the sentence.[1]

¶ 20    So this is not a situation where the court completely prohibited Hernandez from examining N.W. about her deferred judgment and sentence. The court drew the line, however, when

---

[1] After this testimony was given, Hernandez's counsel objected. The court sustained the objection, but counsel did not move to strike the testimony, and the court did not do so sua sponte.

Hernandez's counsel attempted to question N.W. about how her deferred judgment and sentence would be impacted if she was charged with providing false testimony.

¶ 21     We perceive no error in the district court's conclusion that this line of questioning was speculative. First, it was based on the speculative assertion that N.W.'s original statements to law enforcement were false. Second, the question assumed N.W. would be convicted of a crime if she changed her allegedly false statements at trial. Third, it assumed that the People would then seek to revoke her deferred judgment and sentence. Thus, the question contained multiple levels of speculation.

¶ 22     In sum, Hernandez's counsel was allowed to establish that N.W. was serving a deferred judgment and sentence that was being supervised by the probation department. And counsel was allowed to elicit that N.W. would suffer serious adverse consequences if she violated the terms of her deferred judgment and sentence. We therefore perceive no abuse of discretion in the trial court's ruling prohibiting Hernandez's counsel from further examining N.W. about the prospects and consequences of her deferred judgment and

sentence being revoked. *See Conyac*, ¶ 93; *Gonzales-Quevedo*, 203

P.3d at 614.

III.  Menacing Charges

¶ 23    Hernandez next argues that the trial court erred because it did

not merge his menacing convictions, violating his protection against

double jeopardy.  He argues that the menacing convictions should

have been merged because he threatened the same person within a

short period of time, even though he used different weapons.  We

agree.

A.  Preservation and Standard of Review

¶ 24    The United States Constitution prohibits a defendant from

being punished more than once for the same offense.  U.S. Const.

amend. V ("No person shall be . . . subject for the same offence to be

twice put in jeopardy of life or limb . . . .").  Thus, charging a

defendant with multiple counts and imposing multiple punishments

for the same offense is prohibited.  *See Woellhaf v. People*, 105 P.3d

209, 214 (Colo. 2005).

¶ 25    One type of multiplicity "involves a series of repeated acts that

are charged as separate crimes even though they are part of a

continuous transaction and therefore actually one crime." *Id.*

Whether convictions must be merged because they are multiplicitous is a question of law that we review de novo. *People v. Robinson*, 2022 COA 124, ¶ 8.

¶ 26    While Hernandez did not raise his double jeopardy claim regarding merger of the menacing charges either before trial or at the sentencing hearing, we may review an unpreserved double jeopardy claim for the first time on appeal. *See Whiteaker v. People*, 2024 CO 25, ¶¶ 22-23.

¶ 27    Although the People's answer brief did not acknowledge the controlling import of *Whiteaker*, as Hernandez points out, it holds that the failure to merge multiplicitous counts is not subject to plain error review. Rather, "double jeopardy sentencing errors are treated differently: when a defendant establishes that a trial court entered multiplicitous punishments in violation of double jeopardy principles, merger is the remedy." *Id.* at ¶ 24. As the supreme court explained,

> Double jeopardy sentencing errors shouldn't
> be confused with structural errors. *See*
> [*Reyna-Abarca v. People*, 2017 CO 15, ¶ 46]
> (rejecting the argument that double jeopardy
> multiplicity issues constitute structural error).
> Nor are they trial errors as we've defined that
> term because failure to merge a lesser-

> included offense into the greater does not "occur 'during the presentation of the case to the jury,'" *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001) (quoting *Cooper v. People*, 973 P.2d 1234, 1242 (Colo. 1999)). Thus, double jeopardy sentencing errors comprise a category of errors adjacent to, but separate from, the established structural-error/trial-error dichotomy.

*Id.* at ¶ 24 n.3. Thus, we review de novo whether claims are multiplicitous and therefore must be merged. *Id.* at ¶ 9.

## B. Analysis

¶ 28 When determining whether a defendant's conduct supports multiple charges and convictions, we must first determine the unit of prosecution for the charged offenses. *People v. Manzanares*, 2020 COA 140M, ¶ 41. The unit of prosecution refers to the way a criminal statute defines a defendant's behavior for prosecution purposes. *Id.* After determining the unit of prosecution, we must determine whether, based on the evidence admitted at trial, the defendant's conduct constituted "factually distinct offenses." *Id.* at ¶ 42.

¶ 29 Hernandez argues that the "unit of prosecution" for a menacing charge is "the number of victims" rather than the volitional acts underlying the alleged offense. Therefore, because he

threatened the same person within a short period of time, he contends that the two menacing convictions should have been merged into one.

¶ 30     We agree with Hernandez that because "the prohibition against menacing is meant to protect victims from harm[,] . . . the unit of prosecution for menacing is defined in terms of the number of victims." *People v. Snider*, 2021 COA 19, ¶ 53. But even so, merger is not appropriate if Hernandez's conduct constituted two factually distinct offenses. *Manzanares*, ¶ 63.

¶ 31     When determining whether two or more charged offenses are factually distinct and thus may support more than one conviction, we may consider

> [(1)] whether the acts charged have occurred at different times, were separated by intervening events, or occurred at the same place; [(2)] whether there are separate instances of volitional acts involving a new volitional departure . . . leading to a fresh impulse; and [(3)] whether the defendant had time to reflect before embarking on a "new outrage."

*Id.* at ¶ 64 (quoting *Quintano v. People*, 105 P.3d 585, 591-92 (Colo. 2005)). We may also consider the defendant's intent in committing the various acts. *People v. Wagner*, 2018 COA 68, ¶ 13. "[N]o one

14

factor is dispositive and the inquiry ultimately focuses on 'all the evidence introduced at trial to determine whether the evidence on which the jury relied for conviction was sufficient to support distinct and separate offenses.'" *Id.* (quoting *Quintano,* 105 P.3d at 592).

¶ 32    After the confrontation escalated, Hernandez "ended up grabbing a blender blade." N.W. stated that Hernandez then raised the blender blade to within a foot of her face and threatened to cut her "face like the Joker."[2] In response to the threat, N.W. slid back approximately two feet on the bed until she was against the wall. Hernandez, after setting down the blender blade, pulled N.W. off the bed.

¶ 33    N.W. managed to get back onto the bed, while Hernandez continued to scream at her. Hernandez then grabbed a kitchen knife with a seven- or eight-inch blade. Hernandez pointed the knife at N.W. and told her he was going to skin her alive and cut her from the waist down, and that she wasn't going to walk out of there alive.

---

[2] This statement referred to a popular *Batman* villain, whose mouth is slit open at the edges to make his mouth wider.

¶ 34    While a close call, we conclude that the trial court erred by not merging the two menacing convictions.  As Hernandez points out, his conduct was committed against the same person, and at the same location, within a short period of time.  In addition, N.W. admitted that she had told police that about five minutes passed between the two incidents.  These factors weigh in favor of a conclusion that the events constituted a single menacing.

¶ 35    True, as the People note, Hernandez had discarded the blender blade before wielding the knife.  And during that time, he pulled N.W. from the bed, causing a painful injury to her leg.  Thus, he had briefly disengaged from his threats with the blender blade before re-engaging by grabbing the knife and pointing it at N.W.  Moreover, he used the two weapons to threaten N.W. with different types of injury — disfigurement with the blender blade and death with the knife.  These factors arguably support a conclusion that the acts were separate offenses.

¶ 36    Despite these competing factors, the central intent of Herandez's repeated threats was to achieve the same purpose: to intimidate and punish N.W. for her alleged infidelity.  Both the threat with the knife and the threat with blender blade served these

purposes — they were committed within five minutes of one another and in the same place, and they were part of a continuing pattern of intimidation. Thus, considering all the relevant factors de novo, we conclude that the two acts were part of a continuous course of menacing. Hernandez's menacing convictions must therefore merge.

## IV. Disposition

¶ 37 The two menacing convictions are merged and the case is remanded to the trial court to amend the mittimus to reflect the merger. We otherwise affirm the judgment of conviction.

JUDGE J. JONES and JUDGE GROVE concur.