The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 22, 2022

## 2022COA145

**No. 21CA1615, *Creekside v Sullivan* — Torts — Defamation;
Courts and Court Procedure — Regulation of Actions and
Proceedings — Action Involving Exercise of Constitutional
Rights — Anti-SLAPP — Special Motion to Dismiss**

In this anti-SLAPP case, a division of the court of appeals
applies the heightened evidentiary burden articulated in *L.S.S. v.
S.A.P.*, 2022 COA 123, ¶ 41.  In so doing, the division concludes
that because Plaintiffs failed to produce clear and convincing
evidence that Defendant's communications were made with actual
malice, and since the remainder of her communications were
nonactionable as a matter of law, the district court erred in denying
Defendant's special motion to dismiss filed pursuant to section 13-
21-1101(3)(a), C.R.S. 2022.  We further determine that, on remand,

the district court must enter an award of attorney fees and costs for

Defendant consistent with section 13-21-1101(4)(a), C.R.S. 2022.

COLORADO COURT OF APPEALS                    **2022COA145**

Court of Appeals No. 21CA1615
Saguache County District Court No. 20CV30024
Honorable Crista Newmyer-Olsen, Judge

Creekside Endodontics, LLC, and Andrew Stubbs,

Plaintiffs-Appellees,

v.

Kathryn Sullivan,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE FOX
Tow, J., concurs
Yun, J., specially concurs

Announced December 22, 2022

Gelman & Norberg LLC, Weston Cole, Greenwood Village, Colorado, for
Plaintiffs-Appellees

Ballard Spahr LLP, Ashley I. Kissinger, Denver, Colorado; Ballard Spahr LLP,
Lauren Russell, Washington, D.C., for Defendant-Appellant

¶ 1     Defendant, Kathryn Sullivan, appeals the district court's denial of her special motion to dismiss defamation claims brought against her by Creekside Endodontics, LLC, and Andrew Stubbs (collectively, Plaintiffs). Sullivan sought dismissal under Colorado's recently enacted anti-SLAPP statute.[1] *See* § 13-20-1101(3)(a), C.R.S. 2022.

¶ 2     Because we conclude there is not a reasonable likelihood that Plaintiffs will prevail on their defamation claims, we reverse and remand with directions to dismiss the complaint and award Sullivan attorney fees and costs pursuant to section 13-20-1101(4)(a).

## I.     Factual Background

¶ 3     Dr. Stubbs, a licensed dentist, is the owner and sole member of Creekside Endodontics. Sullivan was his patient. After Dr. Stubbs performed root canal therapy on Sullivan, she was dissatisfied with the procedures and publicly expressed her dissatisfaction.

---

[1] "SLAPP" is an acronym for "strategic lawsuits against public participation."

1

¶ 4 In early July 2019, Sullivan came to Creekside Endodontics complaining of severe pain in four teeth — specifically, teeth numbers 3, 5, 6, and 13. After examining her, Dr. Stubbs determined that the four affected teeth required treatment and that a metal file was embedded in tooth number 3 (apparently from shoddy dental work performed by another dentist). Dr. Stubbs advised Sullivan that she had three options: (1) do nothing, (2) undergo root canal therapy, or (3) have the teeth extracted. Sullivan elected to proceed with root canal therapy.

¶ 5 Over the span of several appointments between July 22 and August 5, Dr. Stubbs completed root canal therapy on the four teeth. While treating Sullivan, Dr. Stubbs discovered that teeth numbers 3 and 13 were fractured. He informed her of this discovery and explained that this reduced the likelihood of a successful treatment for the affected teeth; she chose to proceed with the surgery.[2]

¶ 6 Within days, Sullivan emailed Dr. Stubbs complaining of persistent pain in tooth number 3. Dr. Stubbs prescribed pain

---

[2] Sullivan claims she was only informed that tooth 3 was fractured.

medication, steroids, and antibiotics to mitigate the pain. Soon after, Sullivan posted a positive review on Yelp of Creekside Endodontics and Dr. Stubbs.

¶ 7     But Sullivan's pain soon returned. Acting as her own advocate, Sullivan began conducting independent research on root canal therapy. As part of this research, she emailed Dr. Franklin Pineda on August 22 with copies of the x-rays Dr. Stubbs had taken and described experiencing severe pain.[3] Dr. Pineda concluded that (1) dental filling material extended beyond the roots (i.e., the tip) of teeth numbers 5, 6, and 13; and (2) the roots of teeth numbers 5 and 13 were in close proximity to one of her sinuses. He opined that the overfilling — especially in the two teeth close to the sinus — could be causing her pain.

¶ 8     Armed with this information, Sullivan contacted Dr. Stubbs, told him that she was experiencing intense pain, and asked whether an "overfilling" of her root canals could be the cause. During the ensuing email exchange — from August 23 through September 4 —

_____

[3] Dr. Pineda is an endodontist educated and licensed in Mexico. He held a postgraduate teaching position in endodontics at the University of Washington and is an affiliate member of the American Endodontic Association.

Dr. Stubbs persistently denied that overfilling occurred and stated that, even if the canals were overfilled, it was not the cause of her pain. He repeatedly offered to re-examine her.

¶ 9　　　Meanwhile, Sullivan continued her research. To that end, she posted a comment on Denver Dental Peeps (a dental-focused Facebook group) on August 25, in which she claimed that her "sister" had undergone root canal therapy but was still in severe pain. She included the x-rays Dr. Stubbs had taken and floated the possibility that the pain was caused by overfilling of the canals. Several posts disagreed with this diagnosis, commenting that the root canals looked good, the fillings within normal limits, and the pain may be attributable to underlying fractures in the teeth. With the exception of one commenter (who identified herself as a dental assistant), the commentators did not indicate their credentials.

¶ 10　　　Owing to her continued pain, Sullivan returned to Dr. Stubbs' office for a follow-up examination on September 5. Dr. Stubbs performed cone-beam computed tomography (CBCT) scans — essentially a three-dimensional x-ray — on each tooth he had treated. After reviewing the images, Dr. Stubbs discovered that teeth numbers 5 and 6 were overfilled, and that gutta percha (a

thermoplastic filling that is heated and compressed into the tooth's canal) extended one millimeter beyond the tip of tooth number 13. He also learned that he had missed a canal on tooth number 3. Dr. Stubbs uploaded these CBCT images onto a CD and gave it to Sullivan.

¶ 11 Although Dr. Stubbs filled the remaining canal on tooth number 3, Sullivan's pain persisted. As she had in late August, Sullivan continued to ask Dr. Stubbs whether the overfilling was the cause of her pain — a theory that he persistently rejected. Instead, Dr. Stubbs advised her to see a neurologist.

¶ 12 On September 19, a week after treating tooth number 3, Dr. Stubbs terminated his doctor-patient relationship with Sullivan — citing her "adversarial" behavior — and denied her request for a full refund. In response, Sullivan said, "[Y]ou want to escape community accountability. Okay, but it is your reputation on the line."

¶ 13 In early October, Sullivan temporarily relocated to Florida to live with family. On October 15, 2019, she saw a dentist in Florida,

Dr. Carlo Litano.[4] Dr. Litano took new CBCT scans because he was unable to view the ones on Dr. Stubbs' CD. Based on his analysis of these images, Dr. Litano concluded that teeth numbers 5, 6, and 13 were overfilled, that number 13 had material extruding near the sinus, and that there were multiple infections near these locations.

¶ 14 After leaving Dr. Litano's office, Sullivan went directly to another dentist, Dr. Paul Rodeghero.[5] She showed Dr. Rodeghero her images and he agreed that, at a minimum, tooth number 5 needed to be removed. Sullivan scheduled to have that tooth extracted on October 25.

¶ 15 The next day, she emailed Dr. Stubbs screenshots of the scans Dr. Litano had taken and explained that her in-person consultations with other dentists proved that the overfilling was worse than she originally thought. Dr. Stubbs reiterated his disagreement that her pain was caused by overfilling.

---

[4] Dr. Litano is a dentist educated and licensed in Florida. According to his declaration, he focuses his practice on "biological and integrative dentistry."
[5] Although Dr. Rodeghero did not provide a declaration reciting his professional credentials, the record shows he is a licensed dentist.

¶ 16    On October 17, 2019, Sullivan posted a one-star review on

Creekside Endodontics' Yelp page accompanied by the following

text:

> On the surface, it is a very professional office
> staff.  Unfortunately, the work done is sub par
> and below the standard of care.  Dr. Stubbs
> overfilled 3 out of 4 of my root canals causing
> great pain and the need for surgery or surgical
> extraction.  He has refused all accountability
> and tried to send me to a neurologist rather
> [than] rectify the damage.  Overfilling is in my
> sinus and has caused me pain for nearly three
> months now.  When I confronted Dr. Stubbs
> about it, he fired me from the practice.
> Radiographic evidence attached.  Overfilling
> has been confirmed by several endodontists
> and dentists and is very obvious even to a lay
> persons [sic] eyes.

Sullivan attached screenshots of the images from Dr. Litano and Dr.

Stubbs.

¶ 17    To Sullivan's disappointment, her post was soon categorized

as a "not currently recommended" review, and thus not readily

viewable by Yelp users.  Undeterred, she tried again, posting

another one-star review about Dr. Stubbs on October 21, 2019,

(without reference to Creekside Endodontics):

> Root canals significantly overfilled causing
> sinus perforation and pain that effects [sic]
> teeth/nose/sinus/eye from the moment they

were obturated.  Dr. Stubbs refuses to rectify or be accountable for the harm he has caused!

I have uploaded radiographic evidence and photos.

Sullivan attached screenshots of Dr. Litano's images with the review.

¶ 18     Because she was still in pain, Sullivan proceeded to have Dr. Rodeghero remove tooth number 5 on October 25, 2019.  After surgery, Dr. Rodeghero provided physical confirmation of Sullivan's theory that excess sealer was coming out of tooth number 5, that the tooth was infected, and that tooth number 6 was also overfilled (an observation made possible by virtue of it being next to removed tooth number 5).

¶ 19     Shortly after her appointment with Dr. Rodeghero, Sullivan posted her third and final one-star review (this time on Google) of Creekside Endodontics:

> 3 of the 4 root canals Dr. Stubbs did are significantly overfilled causing major pain in the teeth/ sinus/ eyes/ neck/shoulders from the moment they were obturated.  I suffered for over a month before another endodontist alerted me that they were overfilled.  Dr. Stubbs ignored my pain and then completely denied that overfilling causes pain.  Any foreign material in the body CAUSES PAIN!!

He tried to gaslight me to escape accountability for the harm he did! He also actively tried to hide the overfilled when taking a CT scan and gave me blank CDs. I took a CT at TWO other offices and the overfills are even worse [than] I imagined. I have had one of the three teeth extracted already and there is still gutta percha and sealer left in the bone requiring additional surgical removal. The tooth had gutta percha sticking out of it and into the gum which caused a massive infection leading to bone being completely destroyed on one side. I have two more teeth to extract because of his damage. These are not straightforward extractions due to the foreign material he left. One of the teeth has gutta percha in the sinus.

SHAME ON YOU FOR NOT LISTENING TO ME AND DENYING MY PAIN, DR STUBBS! YOU HAVE CAUSED MAJOR DAMAGE AND HAVE DONE NOTHING TO RECTIFY IT!

¶ 20 Plaintiffs sued Sullivan for libel per se and trade and product disparagement based on the allegedly defamatory posts. Sullivan filed a special motion to dismiss, relying on section 13-20-1101(3)(a), which the court denied.[6]

---

[6] This was the third special motion to dismiss that Sullivan filed in this lawsuit. She filed the first pro se, the second after obtaining counsel (who amended the first), and the third after the district court denied her second motion and granted Plaintiffs leave to amend their complaint.

II.    Applicable Law and Standard of Review

¶ 21    Colorado's anti-SLAPP statute seeks to minimize the risk of nonmeritorious lawsuits being used to silence another based on their exercise of First Amendment rights.  § 13-20-1101(1)(a); *L.S.S. v. S.A.P.*, 2022 COA 123, ¶¶ 14-17.  It thus aims to balance the "constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government" with the "rights of persons to file meritorious lawsuits for demonstrable injury."  § 13-20-1101(1)(b); *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶¶ 11-12.

¶ 22    To that end, the statute creates a procedural mechanism that allows a district court to assess a lawsuit at its early stages and determine whether it is nonmeritorious (the idea being to weed out lawsuits that are not being used to address a legal injury, but instead seek to dissuade another from exercising their First Amendment rights).  *See* Andrew L. Roth, Comment, *Upping the Ante: Rethinking Anti-SLAPP Laws in the Age of the Internet*, 2016 BYU L. Rev. 741, 745-48 (2016) (describing the theoretical underpinnings of SLAPP lawsuits).

¶ 23    As another division of this court cogently described,

> The statute allows a person (usually a defendant) to file a special motion to dismiss "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue." § 13-20-1101(3)(a).  The trial court then "consider[s] the pleadings and supporting and opposing affidavits" to determine whether "the plaintiff has established that there is a *reasonable likelihood that the plaintiff will prevail on the claim.*" § 13-20-1101(3)(a)-(b).

*L.S.S.*, ¶ 18 (emphasis added).  If the court determines there is not a reasonable likelihood that the plaintiff will prevail on her claim, it must grant the motion and award the defendant attorney fees and costs.[7] § 13-20-1101(3)(a), (4)(a).

¶ 24     We review de novo a district court's ruling on a special motion to dismiss to determine whether the plaintiff has established a "reasonable likelihood" that she will prevail on her claim.  *Salazar*, ¶ 21.

---

[7] There is one exception to this rule: a prevailing party is not entitled to attorney fees and costs "if that cause of action is brought pursuant to part 4 of article 6 of title 24 or the 'Colorado Open Records Act', part 2 of article 72 of title 24." § 13-20-1101(4)(b), C.R.S. 2022.

11

¶ 25    This entails a two-step process.  First, we consider "whether the defendant has made a threshold showing that the conduct underlying the plaintiff's claim falls within the scope of the anti-SLAPP statute — that is, that the claim arises from an act 'in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue.'" *L.S.S.*, ¶ 21 (quoting § 13-20-1101(3)(a)).  If so, the court evaluates whether the plaintiff has established a "reasonable likelihood [of] prevail[ing] on the claim." *Id.* at ¶ 22 (quoting § 13-20-1101(3)(a)-(b)).

¶ 26    For this second step, we review "the pleadings and the evidence to determine 'whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.'" *Id.* at ¶ 23 (quoting *Baral v. Schnitt*, 376 P.3d 604, 608 (Cal. 2016)).  In so doing, "[t]he court does not weigh evidence or resolve conflicting factual claims" but simply "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." *Id.* at ¶¶ 23-24 (quoting *Baral*, 376 P.3d at 608).

12

### III. Discussion

#### A. Step One: Protected Activity

¶ 27 The district court concluded that Sullivan's reviews were made "in connection with a public issue" and are therefore subject to section 13-20-1101(3)(a). This determination matters because if Sullivan's communications were made in connection with a public issue, then Plaintiffs' must prove, at trial, that she made the statements with actual malice (and, as we explain below, establish a reasonable likelihood that they will be able do so at the special motion to dismiss stage). *See L.S.S.*, ¶¶ 36-37.

¶ 28 Plaintiffs initially argued that Sullivan's statements related to a matter of "purely private concern" and were thus outside the scope of the anti-SLAPP statute. But they did not submit argument on this issue in their appellate briefs. And while their counsel asserted during oral argument that the statements were a matter of private concern, we will not consider this contention because of their failure to develop this argument in their briefs. *See Barnett v. Elite Props. of Am., Inc.*, 252 P.3d 14, 19 (Colo. App. 2010) ("We will not consider a bald legal proposition without argument or development. Counsel must inform the court both as to the specific

13

errors asserted and the grounds, supporting facts, and authorities to support their contention.") (citation omitted); *see also Galvan v. People*, 2020 CO 82, ¶ 45 (discussing party presentation principle).

¶ 29 We therefore assume, without deciding, that Sullivan's reviews were made "in connection with a public issue." § 13-20-1101(3)(a); *see L.S.S.*, ¶ 28 (declining to decide whether an act was made "in connection with a public issue" because the parties agreed that it was).

## B. Step Two: Reasonable Likelihood

¶ 30 The parties disagree over the meaning of "reasonable likelihood" in this specific context — namely, where the defamatory statements involve a matter of public concern. Plaintiffs urge us to adopt the district court's reasoning; under that rubric, we must deny a special motion to dismiss if Plaintiffs' claim has "'minimal merit' and . . . there is a 'reasonable likelihood' they will prevail." Sullivan, by contrast, argues that Plaintiffs must show, by clear and convincing evidence, that they have a reasonable likelihood of prevailing at trial.

¶ 31 Another division of this court addressed this precise issue in *L.S.S.* Drawing on California cases interpreting a substantively

identical anti-SLAPP statute, Colorado cases applying the clear and convincing standard at summary judgment, and a balancing of the interests implicated by the statute, the division concluded that the heightened standard applied. *L.S.S.*, ¶¶ 42-44. Accordingly, it held that

> in order to withstand a special motion to dismiss where a showing of actual malice will be required at trial, a plaintiff must establish a probability that they will be able to produce clear and convincing evidence of actual malice at trial.

*Id.* at ¶ 41.

¶ 32     We agree with the reasoning and holding of the *L.S.S.* division and therefore adopt its reasoning.

¶ 33     With that burden in mind, we now analyze whether Plaintiffs established a probability that they will be able to produce clear and convincing evidence of actual malice at trial. We conclude that Plaintiffs failed to meet this burden with respect to Sullivan's actionable statements, and we further determine that the remainder of her statements are not actionable.

### 1. Defamation: General Principles

¶ 34    Defamation is a communication that holds an individual up to contempt or ridicule, causing them injury or damage. *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). The elements are:

> (1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication.

*Lawson v. Stow*, 2014 COA 26, ¶ 15 (quoting *Williams v. Dist. Ct.*, 866 P.2d 908, 911 n.4 (Colo. 1993)).

¶ 35    The party claiming defamation, however, is subject to a heightened burden of proof when the challenged statement relates to a matter of "public concern." *Id.* at ¶ 18; *see also Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1121 (Colo. App. 1992) ("[A] defamatory statement addresses a matter of public concern whenever it embraces an issue about which information is needed or is appropriate."). As relevant here, the plaintiff must prove, by clear and convincing evidence, that the speaker made the statements with "actual malice." *Lawson*, ¶ 18.

¶ 36     In contrast to the preponderance of evidence standard —

which only requires proof that a fact is "more probable" than not,

*Page v. Clark*, 197 Colo. 306, 318, 592 P.2d 792, 800 (1979)

(quoting Charles T. McCormick, *The Law of Evidence* § 339 (2nd ed.

1972)) — the clear and convincing standard requires proof that a

fact is "highly probable and free from serious or substantial doubt."

*Destination Maternity v. Burren*, 2020 CO 41, ¶ 10 (citation omitted).

¶ 37     A communication is made with actual malice if it is published

with "actual knowledge that it was false" or "with reckless disregard

for whether it was true." *L.S.S.*, ¶ 40.  To be sure, it is rare for there

to be evidence that the speaker *knew* their statement was false yet

published it anyway.  *See, e.g., Burns v. McGraw-Hill Broad. Co.*,

659 P.2d 1351, 1361-62 (Colo. 1983) (where speaker in fact "knew"

that the statements were false).  Our inquiry therefore typically

turns on whether the publisher made the statement with "reckless

disregard."

¶ 38     Thus, actual malice is proved by evidence that the publisher

"entertained serious doubts as to the truth of the statement or

acted with a high degree of awareness of its probable falsity."  *Fry v.*

*Lee*, 2013 COA 100, ¶ 21.  Unless it is "grossly inadequate," an

17

investigation by a layperson that forms the basis of a defamatory statement is insufficient to show actual malice. *Reddick v. Craig*, 719 P.2d 340, 342 (Colo. App. 1985). Similarly, a speaker's "failure to corroborate information received from [an otherwise] reliable source" — which later turns out to be incorrect — does not establish actual malice. *Lewis*, 832 P.2d at 1124. Nor does evidence that the defamed party simply denied the veracity of the speaker's statement show actual malice. *Seible v. Denver Post Corp.*, 782 P.2d 805, 809 (Colo. App. 1989); *accord DiLeo v. Koltnow*, 200 Colo. 119, 126-27, 613 P.2d 318, 324 (1980) (concluding actual malice was not proved because the "defendants' sources were reliable, and a thorough independent investigation was conducted to substantiate the truthfulness of the statements").

¶ 39    Although a speaker's ill will toward the defamed party is not an element of actual malice, evidence of such bad motive "may serve as circumstantial evidence of actual malice 'to the extent that it reflects on the subjective attitude of the publisher.'" *L.S.S.*, ¶ 40 (quoting *Balla v. Hall*, 273 Cal. Rptr. 3d 695, 683 (Ct. App. 2021)) (collecting cases on this point).

## 2. Analysis

¶ 40    We begin by observing that Sullivan's reviews contain two types of statements: those that concern Dr. Stubbs' alleged overfilling (e.g., he overfilled the canals, this caused her pain, etc.) and those that concern his reaction to her complaints (e.g., he ignored her pain, he "gaslighted" her, etc.). We first address the statements related to his dental work, before turning to those that concern his handling of Sullivan's dissatisfaction with that work.

### a. Statements Related to Dental Work

¶ 41    Sullivan argued that she sincerely believed Dr. Stubbs overfilled three of the four teeth he treated and that the overfilling was the cause of her pain. As pertinent here, she supported her position with (1) declarations of Dr. Pineda and Dr. Litano, and her own declaration; (2) the patient notes Dr. Rodeghero took post-surgery; and (3) all email communication between herself and Dr. Stubbs.

¶ 42    Plaintiffs sought to prove actual malice with (1) Dr. Stubbs' attestation, (2) an affidavit of a dental assistant who was involved in Sullivan's care, and (3) some of the same emails Sullivan provided.

¶ 43    We conclude that Plaintiffs cannot prove actual malice.  As Dr. Pineda, Dr. Litano, Dr. Rodeghero, and Dr. Stubbs himself observed, teeth numbers 5 and 6 were, in fact, overfilled, and gutta percha extended beyond the tip of tooth number 13.  Whether Sullivan made the statements with actual malice thus hinges on whether she "entertained serious doubts" that this overfilling *could be* the cause of her pain.  *Fry*, ¶ 21.

¶ 44    But three dentists told Sullivan the overfilling could be the cause of her pain, and she based her statements on these professional opinions.  Plaintiffs argue that, because one dentist practices in Mexico and the other two practice nonmainstream forms of dentistry, their professional opinions are inherently unreliable.  This argument fails because it does not explain why their opinions are unreliable — let alone that Sullivan had serious reason to doubt the accuracy of their diagnoses.  *See id.*  And even if she was misguided in believing that overfilling was the cause of her pain, there is no evidence that she doubted the opinions of the dentists on whom she relied yet published the statements anyway. *See Lewis*, 832 P.2d at 1124.

¶ 45    Her disregard of contrary opinions on the Dental Peeps thread also does not show actual malice. The district court found that Sullivan's rejection of these viewpoints and later concession that root canal therapy was an "inexact science" shows that she may have made the statements with a reckless disregard for their truth. This ignores that her consultation of the online thread was but one small part of a two-month-long investigation. And even if Sullivan incorrectly concluded that the overfilling caused her pain, it cannot be said that her investigation was "grossly inadequate." *Reddick*, 719 P.2d at 342. In the end, she chose to believe the opinions of three dentists — two of whom examined her in person — with credentials she trusted, rather than the Dental Peeps commenters who opined, based on screenshots of the images, that Dr. Stubbs' work appeared normal.

¶ 46    Similarly, Dr. Stubbs' persistent disagreement that the overfilling caused her pain is insufficient to establish actual malice. Sullivan was not required to take Dr. Stubbs' professional opinion as conclusive fact over those of three other dentists she consulted. His denial, in other words, is not evidence that she knew he was

21

probably correct yet proceeded regardless.  *See Seible*, 782 P.2d at 809; *DiLeo*, 200 Colo. at 126-27, 613 P.2d at 324.

¶ 47    This case is quite unlike *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 677-88 (1989), in which the Court found actual malice after the speaker based its assertion on a highly biased source, ignored evidence refuting that source, and avoided talking to the only person who could corroborate that source.  Here, by contrast, Sullivan engaged in a lengthy investigation, received conflicting viewpoints, and ultimately chose to believe one professional opinion over another.

¶ 48    It could be argued that Sullivan's ill will toward Dr. Stubbs shows actual malice.  After all, when Dr. Stubbs rejected her request for a refund, Sullivan responded, "[Y]ou want to escape community accountability.  Okay, but it is your reputation on the line."  While this ominous assertion tends to show bad motive, it is not enough to establish a reasonable likelihood that Plaintiffs will be able to prove, by clear and convincing evidence, that Sullivan made the challenged statements with actual malice.

¶ 49    All told, Plaintiffs did not show a reasonable likelihood that Sullivan made the statements related to Dr. Stubbs' dental work with actual malice.

        b.     Statements Addressing Sullivan's Dissatisfaction

¶ 50    In addition to saying that Dr. Stubbs overfilled her teeth, Sullivan also voiced various grievances about his response to her complaints.

¶ 51    Statements of "pure opinion" are nonactionable under defamation principles. *Lawson*, ¶¶ 18, 30. Thus, even if a statement could be characterized as an opinion, it is only actionable if "the underlying defamatory facts which provide a basis for the opinion are false and are not disclosed in the context of the [broader statement]." *Burns*, 659 P.2d at 1360.

¶ 52    Sullivan's varied complaints stemmed from her frustration with Dr. Stubbs' refusal to accept her theory, his suggestion that she consult a neurologist, and his eventual termination of their doctor-patient relationship. Dr. Stubbs claims these statements baselessly imply that he was a callous provider who ignored her pain.

23

¶ 53 Although these assertions plainly cast Dr. Stubbs in a negative light, they are nonactionable because the factual bases for them are included in the reviews. *Id.* These factual bases include (1) that other dentists told Sullivan her teeth were overfilled and causing her pain; (2) that he suggested she see a neurologist rather than provide further treatment of the subject teeth; (3) that she took two additional CBCT scans because the other dentists could not view the ones on Dr. Stubbs' CD; (4) that he terminated their relationship; and (5) the images themselves. Because Sullivan provided the factual reasons for her opinion, her statements are protected by the First Amendment. *See Seible*, 782 P.2d at 809-10 (alleged defamatory statements nonactionable because factual bases for opinions accompanied statements).

## IV. Attorney Fees and Costs

¶ 54 Section 13-20-1101(4)(a) provides that "a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney fees and costs." Because we conclude that Plaintiffs did not have, as a matter of law, a reasonable likelihood of prevailing on

their defamation claims, Sullivan is entitled to recover attorney fees and costs.[8]

## V.     Conclusion

¶ 55    For the reasons stated, we reverse the judgment of the district court denying Sullivan's special motion to dismiss and remand with directions to dismiss the complaint and award Sullivan attorney fees and costs.

JUDGE TOW concurs.

JUDGE YUN specially concurs.

---

[8] Because Plaintiffs' trade and product disparagement claim rises and falls with the defamation claim, it is also subject to dismissal. *See Williams v. Cont'l Airlines, Inc.*, 943 P.2d 10, 16 (Colo. App. 1996) (A plaintiff "may not avoid the strictures of defamation law by artfully pleading their defamation claims to sound in other areas of tort law." (quoting *Vackar v. Package Mach. Co.*, 841 F. Supp. 310, 315 (N.D. Cal. 1993))).

JUDGE YUN, specially concurring.

¶ 56    I respectfully concur in the judgment only.

¶ 57    The parties agree on appeal that Kathryn Sullivan's Yelp and Google reviews were made "in connection with a public issue," § 13-20-1101(3)(a), C.R.S. 2022. Based on this concession[1] and the party presentation rule, I agree that the majority reached the correct result. *See Galvan v. People*, 2020 CO 82, ¶ 45 ("Under our adversarial system of justice, we adhere to the party presentation principle, which relies on the parties to frame the issues to be decided and assigns to courts the role of neutral arbiters of the matters raised.").

¶ 58    I write separately, however, because I am concerned that the majority opinion could be construed as an endorsement that Yelp or Google reviews discussing a business dispute between two private parties is a matter of public concern for purposes of the First Amendment. In my view, Sullivan's online reviews describing a

---

[1] Although the plaintiffs disagree as to whether the actual malice standard applies at the special motion to dismiss stage, § 13-20-1101, C.R.S. 2022, they appear to concede in their briefing that the standard would apply at trial.

dispute with a dentist about her root canal therapy do *not* rise to a matter of public concern.

¶ 59　At common law, the tort of defamation exists to compensate individuals who have suffered harm to their reputations due to the careless or malicious communications of others. *McIntyre v. Jones,* 194 P.3d 519, 524 (Colo. App. 2008) (citing *Keohane v. Stewart,* 882 P.2d 1293, 1297 (Colo. 1994)). Protection of one's reputation "reflects no more than our basic concept of the essential dignity and worth of every human being" and recognizes that once an individual's reputation is damaged, it is extremely difficult to restore. *Id.* (quoting *Keohane,* 882 P.2d at 1297-98, in turn quoting *Rosenblatt v. Baer,* 383 U.S. 75, 92 (1966) (Stewart, J., concurring)).

¶ 60　But the interest of protecting one's reputation is not paramount in all circumstances. *Shoen v. Shoen,* 2012 COA 207, ¶ 21. "It must be weighed against society's interest in encouraging and fostering vigorous public debate [on matters of public concern], an interest protected by the First Amendment to the United States Constitution and article II, section 10 of the Colorado Constitution." *Id.* (quoting *McIntyre,* 194 P.3d at 523-24). To account for this important societal interest, the common law of defamation has been

27

modified in one significant way for certain classes of cases.
*McIntyre*, 194 P.3d at 524.

¶ 61    In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the

United States Supreme Court first recognized that the First

Amendment precludes a public official

> from recovering damages for a defamatory
> falsehood relating to his official conduct unless
> he proves that the statement was made with
> "actual malice" — that is, with knowledge that
> it was false or with reckless disregard of
> whether it was false or not.

*Id.* at 279-80.

¶ 62    The Supreme Court, however, refused to impose a federal

constitutional standard on defamatory statements made about

private individuals.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,

348-49 (1974).  Private individuals, the Court reasoned, were more

vulnerable to injury given their limited opportunities to counteract

false statements.  *Id.* at 344-45.  Unlike public officials, the Court

explained, private persons do not voluntarily expose themselves to

the increased risk of injury from defamatory falsehoods and are

therefore more deserving of recovery.  *Id.*  Thus, the Court held that

"so long as they do not impose liability without fault, the States may

define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347.

¶ 63    Following *Gertz,* the Colorado Supreme Court extended the *New York Times* "actual malice" standard of liability to cases where "a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern." *Walker v. Colo. Springs Sun, Inc.,* 188 Colo. 86, 98, 538 P.2d 450, 457 (1975), *overruled on other grounds by Diversified Mgmt., Inc. v. Denver Post, Inc.,* 653 P.2d 1103 (Colo. 1982); *see also Diversified Mgmt.,* 653 P.2d at 1106 (refining the "actual malice" standard of liability by "adopting the same definition of 'reckless disregard' in cases involving public officials, public figures, and matters of public or general concern").

¶ 64    But Colorado law provides no clear guidelines for determining whether a matter is of "public concern." "Generally, a matter is of public concern whenever 'it embraces an issue about which information is needed or is appropriate,' or when 'the public may reasonably be expected to have a legitimate interest in what is being published.'" *Williams v. Cont'l Airlines, Inc.,* 943 P.2d 10, 17 (Colo.

29

App. 1996) (quoting *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1121 (Colo. App. 1992)). Stated another way, public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public" at the time of publication. *Shoen,* ¶ 25 (quoting *City of San Diego v. Roe,* 543 U.S. 77, 83 (2004)). "[A] matter is of public concern when 'it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . .'" *McIntyre,* 194 P.3d at 525 (quoting *Barrett v. Univ. of Colo. Health Scis. Ctr.,* 851 P.2d 258, 263 (Colo. App. 1993)).

¶ 65     Conversely, Colorado courts have made it clear that private disputes between private individuals are not matters of public concern. *See, e.g., People v. Ryan,* 806 P.2d 935, 939 (Colo. 1991) ("[I]t is inappropriate to require that defamatory false statements must be made with 'actual malice' in situations, such as the present case, where one private person disseminates defamatory statements about another private individual in the victim's community."); *McIntyre,* 194 P.3d 525-26 (statement concerning the qualifications of an applicant for bookkeeper of small homeowners association did not involve a matter of public concern); *Sky Fun 1,*

30

*Inc. v. Schuttloffel*, 8 P.3d 570, 575 (Colo. App. 2000) (statements by a former employer to a prospective employer regarding a pilot's abilities did not involve a matter of public concern), *aff'd in part and rev'd in part on other grounds*, 27 P.3d 361 (Colo. 2001); *Williams*, 943 P.2d at 18 (statements by a flight attendant that a pilot attempted to rape her were not matters of public concern). Although boundaries between a purely private matter and a matter of public concern cannot be readily defined and must be determined on a case-by-case basis, "the balance should be struck in favor of a private plaintiff if his or her reputation has been injured by a non-media defendant in a purely private context." *Williams*, 943 P.2d at 18.[2]

¶ 66    In my view, *Zueger v. Goss*, 2014 COA 61, is instructive. The widow of a renowned Native American artist had a dispute with the

[2] Indeed, it is far from clear whether the boundary delineating private and public matters in this context is, or should be, any different than the boundary between private disputes and matters "in connection with a public issue" sufficient to implicate the protections of the anti-SLAPP statute in the first place. It is at least arguable that if the nature of a particular dispute is not sufficiently of public concern to warrant the constitutional protections of actual malice, it is also not of sufficient public interest to warrant the statutory protections of the anti-SLAPP statute.

plaintiffs, an art dealer and others who handled her deceased husband's artwork. *Id.* at ¶ 2. Believing that the plaintiffs were making and selling unauthorized reproductions of his artwork, the widow made disparaging statements on the internet about the plaintiffs' business activity. *Id.* The plaintiffs, in turn, sued the widow for, among other things, intentional interference with prospective business advantage and defamation. *Id.*

¶ 67 A division of this court held that the widow's statements on the internet about the plaintiffs' business activity did not involve a matter of public concern because they involved a private business dispute between private parties. *Id.* at ¶ 28. In support of this conclusion, the court noted that the record contained no evidence suggesting that anyone other than the widow had been directly affected by the plaintiffs' business activity or that any government entities had become involved. *Id.* Thus, the division concluded that the plaintiffs were not required to prove actual malice to succeed on their claims. *Id.* at ¶¶ 25, 29.

¶ 68 The same can be said about Sullivan's online reviews in this case. The allegedly defamatory statements were made by a nonmedia defendant (Sullivan) about private individuals (a licensed

32

dentist and his dental practice). These statements did not automatically become a matter of public concern because Sullivan posted her reviews on Yelp and Google. *See Snead v. Redland Aggregates Ltd.*, 998 F.2d 1325, 1330 (5th Cir. 1993) ("A speaker cannot turn his speech into a matter of public concern simply by issuing a press release."). Rather, the content and context of Sullivan's statements reveal that they involve a private dispute with her dentist. Specifically, Sullivan's online reviews discuss her dissatisfaction with the root canal therapy she received from Dr. Stubbs because, in her view, he overfilled her root canals, causing extreme pain. The record contains no evidence that Dr. Stubbs' dental care affected anyone other than Sullivan or that Sullivan's message was intended to enlighten the public about a political, social, or other concern in the community. Accordingly, Sullivan's online reviews do not involve a matter of public concern.

¶ 69    In my view, because of the proliferation of internet forums such as Yelp and Google, the majority's opinion risks constitutionalizing defamation claims involving private disputes between private individuals. Today, anyone who is dissatisfied with a local grocery store, florist, pizza parlor, or dentist can write an

33

online review.  While there are benefits to such forums, I do not believe the *New York Times* "actual malice" standard — which was intended primarily to protect media defendants from liability for publishing stories about public officials, public figures, and matters of public concern — was ever intended to apply to such private disputes.

¶ 70     But given the parties' agreement that Sullivan's online reviews were made "in connection with a public issue," I respectfully concur in the judgment only.